UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KATHRYN STRICKLAND, | CASE NO. 1:12CV301 |
| Plaintiff, | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Kathryn Strickland ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

I. **PROCEDURAL AND FACTUAL HISTORY**

On December 21, 2009, Plaintiff applied for DIB and SSI, alleging disability beginning April 1, 2008. Tr. at 118-126. Plaintiff's date last insured is June 30, 2010. Tr. at 11. The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 56-59. On December 3, 2010, the SSA acknowledged Plaintiff's request for an administrative hearing. Tr. at 81-82. On May 16, 2011, an ALJ conducted an administrative hearing where Plaintiff was represented by counsel. Tr. at 23-55. At the hearing, the ALJ accepted the testimony of Plaintiff and Bruce Holderead, a vocational expert ("VE"). On July 11, 2008, the ALJ issued a Decision denying benefits. Tr. at 12-18. Plaintiff filed a request for review, and, on December 13, 2011, the Appeals Council denied Plaintiff's request for review. Tr. at 1-3.

On February 7, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On August 7, 2012, with leave of the Court, Plaintiff filed a brief on the merits. ECF Dkt. #14. On September 21,2012, Defendant filed a brief on the merits. ECF Dkt. #15. No reply brief was filed.

## II. **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from lupus, calcium deposits, pericardial effusion, and gastroesophageal reflux disease (GERD), which qualified as medically determinable impairments under 20 C.F.R. §404.1521, and 416.921. Tr. at 14. However, the ALJ ultimately concluded that Plaintiff did not have an impairment or combination of impairments that significantly limited (or was expected to significantly limit) her ability to perform basic work-related activities for twelve consecutive months, and, therefore, Plaintiff did not have a severe impairment or combination of impairments. As a consequence, the ALJ concluded that Plaintiff had not been under a disability as defined by the SSA and was not entitled to benefits. *Id.* at 18.

## III. **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age,

> education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V. ANALYSIS

Plaintiff, who was forty-eight years old on the day of the hearing, testified that she worked as a full-time home health aide at the Goodrich Gannett Community Center until 2008, when she broke her foot at home. Tr. at 32. While recovering from her broken foot, she "felt like [she] was going to die." Tr. at 32. Initially she attributed her symptoms to influenza. She did not know if she

-3-

could stand, just putting her feet on the floor was difficult, she could not walk, then she began experiencing pain in her chest. Tr. at 33.

Her husband was scheduled to retire in 2009, and she testified that she "hope[d] she would live long enough for him to retire and about a week after he retired is when they took [her] to the hospital for [her] heart." Tr. at 37. She was ultimately diagnosed with pericardial effusion, and fluid around her heart was drained in May of 2009. Tr. at 27, 37. She testified that she still experiences chest pain, but that her doctor has examined her and he said "it was okay." Tr. at 30. She attributed the continuing heaviness in her chest to the tube that was inserted, but she testified that she no longer has pain in her heart. Tr. at 37.

Plaintiff has also been diagnosed with mixed connective tissue disease and arthritis. Tr. at 239. She experiences numbness in her hands when she wakes up at night and can only stand for thirty minutes to an hour. Tr. at 38. Plaintiff's family performs most of the household chores. When Plaintiff washes dishes, she testified that she must sit down for twenty minutes before she can resume washing the dishes. Tr. at 38. When she stands too long she gets pain in her feet, neck, and shoulders. Tr. at 34. She can walk for about a half of an hour. Tr. at 39. If she over exerts herself, she experiences shortness of breath. Tr. at 29. She cannot drive because she has problems grasping and turning the steering wheel and depressing the pedals. Tr. at 31. She testified that she has problems with her grip and that she drops things, however, she conceded that the numbness in her hands only happens when she is sleeping. Tr. at 39. Plaintiff also suffers from calcium deposits that turn into painful sores, however, she conceded at the hearing that they "really do not stop [her] from doing things." Tr. at 34.

Plaintiff testified that she has no hobbies, that she does not visit family and friends, and that the only place that she goes is the library every couple of weeks. Plaintiff and her husband used to walk outside, but stopped because of the weather, and had not resumed. Tr. at 38. She naps three times a week and goes to bed at 5:30 p.m. Tr. at 43. Occasionally, she wakes up at midnight and stays awake for a few hours, but she usually sleeps through the night. Tr. at 43-44. Plaintiff is prescribed Ibuprofen 800 mg. and Etodolac, three times a day, for pain. She is prescribed

Famotidine (for GERD), and Hydroxid (for her heart). Tr. at 35. She testified that her medications cause dizziness a couple of times a month.

Plaintiff began seeing treating physician/rheumatologist, Stanley Ballou, M.D., in 2006. She complained of calcium deposits and skin changes that were found to be consistent with mild discoid lupus, subcutaneous calcinosis, and an undifferentiated connective tissue disease. Tr. at 239. In 2006, there was no evidence of systemic involvement and she was not taking any medications. Dr. Ballou's medical notes in the record begin on May 26, 2009, when she resumed treatment, shortly after she was hospitalized for pericardial effusion.

At the May 26, 2009 appointment, Dr. Ballou diagnosed mixed connective tissue disorder and acute pericarditis and arthritis. His notes indicate that Plaintiff felt "relatively well" that day. When Plaintiff was hospitalized, she presented with swelling, pain, and stiffness in her hands and wrists, and could not make a fist, but she was treated acutely with Prednisone 40 mg daily. She had a dramatic response in terms of her arthritis, with marked improvement over the following ten days. Tr. at 239. Dr. Ballou prescribed Plaquenil 400 mg and encouraged Plaintiff to wean off of Prednisone over the course of several weeks.

Plaintiff saw Dr. Ballou on June 30, 2009. Tr. at 235. His notes reflect that Plaintiff felt minor discomfort that did not affect her functionality, and that she was virtually asymptomatic. Dr. Ballou recommended that Plaintiff continue to wean off of Prednisone. At her September 15, 2009 appointment, Plaintiff reported intermittent pain in her hands, elbows, shoulders, fingers and neck. Dr. Ballou noted that Plaintiff "continues to do well except for mild arthralgias." Tr. at 233. His physical examination yielded normal results. Dr. Ballou recommended that Plaintiff continue to taper off of Predinisone, and indicated that she treated her arthralgias with Ibuprofen and Naproxen.

At Plaintiff's next appointment on January 25, 2010, she reported pain along the radial aspect of each wrist that was aggravated by grasping and holding objects, and mild pain in her knee. She also reported hip pain, but attributed it to excessive physical activity that she engaged in the previous week, which was resolving itself. Tr. at 230. Dr. Ballou's notes indicate that Plaintiff's lupus "seems to be stable." Tr. at 230. His physical examination yielded normal results. Notably, Dr. Ballou reported normal grip strength and normal range of motion in her hips and shoulders. He

diagnosed DeQuervain tendinitis, which he intended to treat symptomatically. Oddly, Plaintiff indicated that she was having trouble sleeping, which contradicts her testimony at the hearing.

Plaintiff presented to the emergency room in February 2010 with left chest/shoulder pain, which she described as sore and throbbing. Tr. at 222. Plaintiff explained that she had been playing Wii, an interactive video game "for an extended period of time" and that the game involved the "repeated swinging of her arms." Tr. at 222. Plaintiff was assessed with having overuse syndrome and referred to physical therapy. Tr. at 223.

Plaintiff underwent an evaluation by Michael A. Harris, M.D., a physical medicine and rehabilitation specialist in March of 2010. Tr. at 215-219. Plaintiff complained of diffuse migrating arthralgias. Dr. Harris noted that Plaintiff was taking Plaquenil only, but nothing consistently for pain or inflammation. Tr. at 215. Dr. Harris prescribed Voltaren and implemented physical therapy. Tr. at 218-219.

When Plaintiff began physical therapy in mid-March 2010, she reported to the therapist that the Voltaren had been helpful . Tr. 210-11. At the next session, Plaintiff reported that she had a lot of energy over the weekend. Tr. 208. Thereafter, she reported "overall improvement in activity and increased energy." Tr. 301. At the end of March 2010, Plaintiff's rated her pain at zero out of ten. Tr. 306. At Plaintiff's fifth physical therapy appointment, she reported that the day before, she did spring cleaning, including washing the windows and the car. Tr. 311. She was sore that night, but "this morning feels good." Tr. 312. Her pain was again at zero out of ten. Tr. 312. Plaintiff also reported zero pain at her sixth session. Tr. 317. Medical records indicate that Plaintiff's strength and function were improving. Tr. 320. In mid-April at her seventh session, Plaintiff reported that she had lifted a heavy object over the weekend and since then, her shoulder had been hurting, with a rating of four out of ten. Tr. 323-24. She was "overall doing well" at the eighth and ninth visits. Tr. 330, 336.

State agency physician, H. Kushner, M.D., reviewed Plaintiff's medical evidence in April 2010, and opined that Plaintiff's pericardial effusion was not a severe impairment for durational reasons, and that her connective tissue disease was otherwise not a severe impairment. Tr. 284. Dr. Kushner noted pertinent clinical findings from Plaintiff's examinations and stated that there was no

-6-

evidence of any ongoing functional limitation . Tr. 284. Dr. Kushner carefully considered Plaintiff's allegations and their reported effect on her functioning and opined that the intensity of her symptoms was not accounted for by any objective somatic data. Tr. 284. He concluded that her credibility was compromised by this disconnect between the evidence and her allegations. Tr. 284. Another state agency physician, W. Jerry McCloud, M.D., reviewed Plaintiff's evidence in July 2010 and concurred with Dr. Kushner's opinion that Plaintiff's impairments were not severe. Tr. 347.

Dr. Ballou next saw Plaintiff on August 16, 2010. Tr. at 376. Plaintiff reported worsening pain in her ankles, feet, wrists, and hands, as well as morning stiffness. She also reported pain in her neck and knees. Dr. Ballou prescribed Ibuprofen 800 mg. On the same day, Dr. Ballou completed a medical source statement. He provided diagnoses of rheumatoid arthritis and lupus. Tr. at 348. He concluded that Plaintiff can only lift or carry ten pounds occasionally and five pounds frequently. He further concluded that Plaintiff is capable of standing for one hour without interruption, and a total of three hours during an eight hour workday. According to Dr. Ballou, Plaintiff's ability to sit is unaffected by her disorders, however she can rarely or never climb, balance, stoop, crouch, kneel, or crawl. She can occasionally reach, handle, feel, push/pull, and engage in fine and gross manipulation. He cited no environmental restrictions, and indicated that Plaintiff did not need an additional rest period during an eight-hour work day, that is, that a morning break, lunch break, and afternoon break scheduled at approximately two hour intervals is sufficient. Tr. at 349. He noted that Plaintiff experiences moderate pain.

At a March 14, 2011 appointment, Plaintiff reported generalized pain and weakness, as well as bilateral numbness in her hands at nighttime. Dr. Ballou's notes read, "Pt states that arthritic symptoms have been constant in severity throughout the past year." Tr. at 369. Despite Plaintiff's complaints, Dr. Ballou indicated only mild tenderness in her shoulders and a full range of motion in all of her extremities. Tr. at 370. He scored her strength as five out of five.

Plaintiff advances two arguments in this appeal. First, she contends that the ALJ erred in concluding that she does not have a severe impairment. Second, Plaintiff contends that the ALJ erred in giving little weight to the opinion of treating physician, Dr. Ballou. Because the resolution

of both argument turns largely on the weight given to Dr. Ballou's opinion, it is important to consider the ALJ's analysis of Dr. Ballou's treatment notes and his medical source statement. The ALJ provided the following summary of Dr. Ballou's treatment notes:

> Subsequent to [Plaintiff's May 26, 2009 appointment], the claimant maintained regular contact with Dr. Ballou every three to six months. Treatment notes reflect complaints of diffuse migratory arthralgias, likely related to her lupus; however, physical examinations routinely reveal unremarkable findings and no objective evidence of functional limitation. In September 2009, the doctor noted normal exams of the claimant's elbows, wrists, ankles, and feet. In January 2010, he indicated that the claimant could ambulate without difficulty, had full range of motion in the shoulders, normal muscle and grip strength, and was asymptomatic with regard to her feet and elbows. In March 2010, he indicated that claimant had a full range of motion in her upper and lower extremities, without evidence of warmth, redness, swelling, effusion, tenderness, or inflammatory changes. During an August followup, Dr. Ballou noted that the claimant's wrists, elbows, feet, and ankles were asymptomatic and that there was no evidence of serious systemic disease. The most recent records from March 2011 continue to note no inflammatory synovitis of the small joints, normal grip strength, normal muscle strength, and an overall stable condition.

Tr. at 16.

In reaching his conclusion that Plaintiff did not have a severe impairment, the ALJ provided the following analysis of Dr. Ballou's treatment notes and medical source statement:

> In addition, great weight has been given to the opinion of the claimant's treating rheumatologist, Dr. Stanley Ballou, who notes on multiple occasions that the claimant did not exhibit any evidence of severe or serious systemic disease. The doctor had a treating relationship with the claimant during the relevant period and has expertise in the area of rheumatology. This conclusion is supported by the objective findings and is consistent with the opinions [of the state agency medical consultants].
>
> However, little weight is given to Dr. Ballou's conclusions regarding the claimant's work related limitations associated with her lupus. He opined that the claimant could lift ten pounds occasionally, lift five pounds frequently and only stand or walk for three hours during an eight-hour workday. In addition, he noted additional postural and manipulative limitations. Such conclusions are inconsistent with the doctor's statements above in which he noted no evidence of the presence of serious systemic disease. In addition, such conclusions are not supported by the doctor's own treatment notes and physical examination findings which routinely show ambulation without difficulty, full range of motion in all joint, and normal muscle strength.

Tr .at 17.

At step two of the sequential evaluation process, the Commissioner must consider whether a claimant has a severe impairment. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "To surmount the step two hurdle, the applicant bears the ultimate burden of establishing that the administrative

-8-

record contains objective medical evidence suggesting that the applicant was 'disabled,' as defined by the Act ...." *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 929 (6th Cir.2007). The Regulations generally define severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c).

The United States Court of Appeals for the Sixth Circuit has generally described step two of the evaluation process as "a *de minimus* hurdle." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir.2009). In *Higgs v. Bowen*, the Sixth Circuit found that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). The *Higgs* court observed that "this lenient interpretation of the severity requirement in part represents the courts' response to the Secretary's questionable practice in the early 1980s of using the step two regulation to deny meritorious claims without proper vocational analysis." *Id.*

However, the court also recognized that "Congress has approved the threshold dismissal of claims obviously lacking medical merit...." *Id.* That is, "the severity requirement may still be employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id.* at 863. Indeed, the *Higgs* court approved of that practice; it affirmed dismissal because the record contained no objective medical evidence to support Ms. Higgs's claims of severe impairment. Particularly relevant to the case at bar, the *Higgs* court observed that "[t]he mere diagnosis of [an ailment], of course, says nothing about the severity of the condition." *Id.*

Since *Higgs*, the Sixth Circuit has regularly found substantial evidence to support a finding of no severe impairment if the medical evidence contains no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition, See, e.g., *Long v. Apfel*, 1 Fed. App'x. 326, 332 (6th Cir.2001); Compare *Maloney v. Apfel*, 211 F.3d 1269 (table), No. 99–3081, 2000 WL 420700 at *2, (6th Cir.2000)(per curiam)(finding substantial evidence to support denial when record indicated claimant showed symptoms and was diagnosed with disorder but did not contain evidence of a disabling impairment that would prevent work); and *Foster v. Secretary of Health & Human Svcs.*, 899 F.2d 1221 (table), No. 88–1644, 1990 WL 41835

at *2 (6th Cir.1990)(per curiam)(finding substantial evidence to support denial when the claimant produced no evidence regarding the frequency, intensity, and duration of arthritic pain; the record indicated that he was no more than slightly or minimally impaired); with *Burton v. Apfel*, 208 F.3d 212 (table), No. 98–4198. 2000 WL 125853 at *3 (6th Cir.2000)(reversing finding of no severe impairment because record contained diagnoses and remarks from a number of treating physicians and psychologists to the effect that claimant was " 'unable to work ... due to the complexity of her health problems'" (quoting physician)); and *Childrey v. Chater*, 91 F.3d 143 (table), No. 95–1353, 1996 WL 420265 at *2 (6th Cir.1996)(per curiam)(reversing finding of no severe impairment because record contained an assessment by a consulting physician reflecting a variety of mental problems that left her "'not yet able to really care for herself alone,'" reports of two other physicians corroborating this, consistent testimony from the claimant, and no medical evidence to the contrary (quoting physician)).

Here, Plaintiff contends that the ALJ erred in giving little weight to the medical source statement of Dr. Ballou. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature,

-10-

and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).

Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

"When a treating physician . . . submits an opinion on an issue reserved to the Commissioner-such as whether the claimant is 'disabled' or 'unable to work'- the opinion is not entitled to any particular weight." *Turner v. Commissioner of Social Security*, No. 09-5543, 2010 WL 2294531 at *4, (6th Cir. June 7, 2010), unreported; *see also* 20C.F.R. §416.927(e)(1). "Although the ALJ may not entirely ignore such an opinion, his decision need only explain the consideration given to the treating source's opinion." *Id.* (internal quotation and citation omitted). In *Turner*, a treating source opined that the claimant was unable to work" and was not "currently capable of a full-time 8-hour workload." *Id.* at *5. The Sixth Circuit held that the ALJ adequately addressed the opinion in stating that it was an opinion on an issue reserved to the Commissioner. *Id.*

Where a treating physician's opinion cannot be given controlling weight, it must be weighed under a number of factors set forth in the Commissioner's Regulations—"namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment

-11-

relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004)(citing 20 C.F.R. § 404.1527(d)(2)). Opinions of one-time examining physicians and record-reviewing physicians and medical experts who testify during administrative hearings are also weighed under these same factors, including supportability, consistency, and specialization. See 20 C.F.R. § 404.1527(d), (f).

The ALJ in this case clearly stated his reasons for giving little weight to Dr. Ballou's opinion. The ALJ correctly concluded that Dr. Ballou's conclusions in his medical source statement are completely at odds with his treatment notes. Likewise, Dr. Ballou's conclusions in the medical source statement are contradicted by the majority of the medical evidence in this case. Defendant cites two and a half pages of references to the medical record wherein various medical professionals acknowledge that Plaintiff's myalgias are mild, Tr. at 371, 377, that her pain did not inhibit her daily functions, Tr. at 232, 235, that she was virtually asymptomatic, Tr. at 230, 235, and that her physical examinations revealed normal results. Tr. at 218, 288. During physical therapy following the injury to her shoulder playing Wii, she reported a zero out of ten on the pain scale on at least three occasions. Tr. at 306, 312, 317. During her physical therapy sessions, Plaintiff reported overall improvement in activity and increased energy as a result of sessions, and that she "feels better after exercise." Tr. at 301. As a matter of fact, examining physician, Michael A Harris, M.D. observed that she "definitely" needed to be more active than she was in March of 2010. Tr. at 219. Accordingly, the ALJ did not err in attributing little weight to the medical source statement of Dr. Ballou nor did he err in concluding that Plaintiff did not have a severe impairment or combination of impairments.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: October 25, 2012

                                          */s/George J. Limbert*
                                          GEORGE J. LIMBERT
                                          UNITED STATES MAGISTRATE JUDGE